[No. A027432. First Dist., Div. Two. Nov. 21, 1985.]

SANTA ROSA MEMORIAL HOSPITAL, Petitioner, v.
THE SUPERIOR COURT OF SONOMA COUNTY, Respondent;
VICTORIA LEARY, Real Party in Interest.

712

**COUNSEL**

Achor & Miller, Gregory G. Spaulding, Horvitz & Levy, Barry R. Levy and David M. Axelrad for Petitioner.

David E. Willett, Catherine I. Hanson and Hassard, Bonnington, Rogers & Huber as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

Jeanine F. Gisvold, Shaw & Gisvold and Daniel U. Smith for Real Party in Interest.

**OPINION**

**KLINE, P. J.**—Petitioner, Santa Rosa Memorial Hospital (the Hospital) seeks a writ of mandate to compel the Sonoma County Superior Court to vacate its order granting the motion of real party in interest, Victoria Leary, to compel answers to 18 questions propounded at the deposition of Vicki Vogler, a nurse epidemiologist and member of the infection control committee at the Hospital. The Hospital contends that the information sought is immune from discovery under Evidence Code section 1157.[1]

---

[1] All further statutory references are to the Evidence Code unless otherwise specified.

The Hospital is a defendant in the court below in a negligence action brought by Leary. The complaint alleges that Leary suffered injuries as the result of an infection which she acquired in the Hospital in 1982. It asserts that the Hospital and a number of fictitiously named defendants negligently treated Leary. It also alleges that the Hospital negligently employed and staffed the Hospital with incapable employees and agents whose carelessness, negligence or lack of ability or training caused Leary's injury and damage.[2]

The Hospital filed its petition for writ of mandate with this court on June 4, 1984. We summarily denied the petition on September 27, 1984. Thereafter, the Hospital petitioned for hearing in the California Supreme Court. That court granted the Hospital's petition for hearing and retransferred the matter to this court with directions to issue an alternative writ. We have done so.

Section 1157 provides in pertinent part: "Neither the proceedings nor the records of organized committees of medical, medical-dental, podiatric, registered dietitian, or veterinary staffs in hospitals having the responsibility of evaluation and improvement of the quality of care rendered in the hospital or medical or dental review or dental hygienist review or chiropractive review or podiatric review or registered dietitian review or veterinary review committees of local medical, dental, dental hygienist, podiatric, dietetic, veterinary, or chiropractic societies shall be subject to discovery. Except as hereinafter provided, no person in attendance at a meeting of any such committee shall be required to testify as to what transpired thereat. The prohibition relating to discovery or testimony shall not apply to the statements made by any person in attendance at such a meeting who is a party to an action or proceeding the subject matter of which was reviewed at such meeting, or to any person requesting hospital staff privileges, or in any action against an insurance carrier alleging bad faith by the carrier in refusing to accept a settlement offer within the policy limits."

In granting the motion to compel answers, the trial court held (1) that none of the disputed questions asked for the proceedings or records of the infection control committee or for testimony "as to what transpired" at a meeting of that committee within the meaning of section 1157, and (2) that if the questions could be deemed to seek such information, the immunity

---

[2]*Elam* v. *College Park Hospital* (1982) 132 Cal.App.3d 332 [183 Cal.Rptr. 156] established that in this state a hospital may be held liable under the doctrine of corporate negligence for negligently screening the competency of its medical staff.

provided by section 1157 did not apply because the infection control committee is not a "medical staff committee" within the meaning of the statute.[3] The court's order also provided that should the Hospital make a showing in further discovery proceedings that the discovery sought from the infection control committee would involve disclosure of the records or reports of a medical staff committee, it would be appropriate for the court to hold an *in camera* hearing and excise any such items from the material required to be disclosed.

The Hospital contends that section 1157 provides a "blanket immunity" from discovery of all records and proceedings of hospital medical staff committees having the responsibility of evaluation and improvement of the quality of care rendered in the hospital. It argues that the infection control committee is such a committee, that the deposition questions at issue sought

[3]The 18 questions at issue are:

1. "What has the return rate been on those cards [which physicians are asked to mail to the hospital if a patient develops an infection after discharge] in terms of its effectiveness, if you know?"

2. "Has Victoria Leary's care and treatment ever been reviewed by the Infection Control Committee?"

3. "In terms of Mrs. Leary, have you ever reviewed her chart?"

4. "Are you aware that Mrs. Leary had a Jackson Pratt drain at the time that she was hospitalized at Santa Rosa Memorial?"

5. "Are you aware that the Jackson Pratt drain that Mrs. Leary had was having some difficulty in draining?"

6. "In terms of the national statistic, do you know whether in 1982, that Santa Rosa Memorial Hospital had a higher percentage rate as far as the Class One clean wound infections?"

7. "Do you know whether Santa Rosa Memorial Hospital in 1982 had a higher than the national statistical standard for contaminated wound infections?"

8. "In 1978, do you know whether Santa Rosa Memorial Hospital had a higher percentage than the national average for the dirty and infected wounds?"

9. "How about 1982?"

10. "Do you know what type of a unit Mrs. Leary was admitted to in April of 1982, whether it was a medical unit, a surgical unit, isolation, whatever?"

11. "Could you tell me whether in connection with Victoria Leary you did any such tabulation [record of number of patients of a physician with wound infections] in connection with Dr. Morris in any increased incidents [*sic*] of wound infection concerning his patients?"

12. "Do you have any information about how they [Santa Rosa Memorial and other hospitals] do compare [with respect to wound infections]?"

13. "Do you know how many pseudomonas infections patients acquired in the hospital at Santa Rosa Memorial in the year of 1982?"

14. "Do you know how many patients acquired staff [*sic*] infections at Santa Rosa Memorial Hospital during their hospitalization in the year 1982?"

15. "Did you ever undertake to specifically try to ascertain the cause of any infection involving Victoria Leary?"

16. "Have you ever been asked to write up in any fashion any information or facts or opinions that you have concerning the source of infection on Victoria Leary?"

17. "Do you know how many times Victoria Leary has been admitted to Santa Rosa Memorial Hospital in connection with a wound infection?"

18. "Do you know whether Dr. Morris reported Mrs. Leary's infection to the head nurse of the units that she was discharged from?"

the committee's "records and proceedings," and that, consequently, the trial court erred in granting the motion to compel. Leary argues that section 1157 has no application to the infection control committee because (1) that committee is not a "medical staff committee" since the majority of its members are not physicians, and (2) the protection of section 1157 is limited to committees having physician "peer review" responsibility, and the infection control committee has no such responsibility. We reject both of these arguments. However, we also reject the Hospital's contention that the information sought from Nurse Vogler is necessarily subject to a blanket immunity from discovery under section 1157.

## I.

The infection control committee is established under the bylaws of the medical staff of the Hospital. The bylaws specify that this standing committee[4] "shall consist of six (6) physician members . . . . It shall also include the Administrator of the Hospital, the Director of Nursing, Nurse Epidemiologist, the Operating Room Supervisor, the Executive Housekeeper, the Chief Engineer, the Director of Central Service, and the Director of the Laboratory; also the Committee shall consist of the following on a consulting basis: Pharmacy, Laundry, Dietary, Department of Education, Emergency Room, X-Ray, Respiratory and Kelly Institute . . . . The Committee shall be charged with the responsibility of investigation, control and prevention of infection within the Hospital and shall do the following: (i) maintain surveillance over the Hospital infection control program; (ii) develop a system for reporting, identifying and analyzing the incidence and cause of all infections; (iii) assist all departments in the establishment of control measures and in the techniques for discovering and preventing infections; (iv) review existing practices throughout the Hospital and participate in establishing a program for education and orientation of all personnel in the practice of isolation and sanitation techniques; (v) develop, evaluate and revise preventive, surveillance and control policies and procedures relating to all phases of the Hospital's activities . . .; (vi) implement action on findings from the Medical Staff's review of the clinical use of antibiotics."

California Administrative Code, title 22, section 70739, subdivision (a), (part of div. 5 (Licensing and Certification of Health Facilities and Referral

---

[4] Pursuant to the bylaws, the standing committees are the executive committee, credentials committee, joint conference committee, medical records committee, procedural review committee, nominating committee, pharmacy committee, institutional review committee, infection control committee, interdisciplinary practice committee, library committee, utilization review committee, intensive care committee, coronary care committee, perinatal committee, medical radiation safety committee, interdepartmental privileges committee, respiratory therapy committee, disaster committee, quality assurance committee, and outpatient services committee.

Agencies), chapter 1 (General Acute Care Hospitals)), provides: "Infection Control Program. (a) A written hospital infection control program shall be adopted. The program shall conform to the guidelines contained in Infection Control in the Hospital, 1974, published by the American Hospital Association, 840 North Lake Shore Drive, Chicago, IL 60611."

The American Hospital Association guidelines provide that each hospital shall establish a committee on infection control, and that membership on the committee "should include representation from the following: hospital administration, internal medicine, microbiology (pathology), nursing, obstetrics, pediatrics, and surgery. In addition, consideration should be given to regular or ad hoc participation by representatives of other departments, including blood bank, central supply, dentistry, dietetics, employee health, housekeeping, house staff, outpatient, and pharmacy." (Infection Control in the Hospital (American Hospital Assn., 4th ed., 1979[5]) p. 23 [hereafter AHA guidelines].) The AHA guidelines do not discuss whether the infection control committee should be a hospital administration committee or a medical staff committee. They recommend, however, that hospitals comply with standards for infection control adopted by the Joint Commission on Accreditation of Hospitals (JCAH). The JCAH Accreditation Manual for Hospitals (hereafter JCAH Manual) standards provide in relevant part: "The Infection Control Committee should be a hospital committee. However, the infection control committee function may be performed by a medical staff committee if representatives of other professional disciplines and the administration participate . . . ." (JCAH Manual, 1985, p. 53.) Thus the JCAH approves the use of a multidisciplinary medical staff committee as the infection control committee.

Leary contends that the multidisciplinary infection control committee is not a medical staff committee because Business and Professions Code section 2282, subdivision (b), provides that "membership on the medical staff shall be restricted to physicians and surgeons and other licensed practitioners." We do not interpret this provision as precluding a medical staff from organizing a committee, pursuant to its bylaws and in accordance with JCAH standards, which includes hospital personnel other than licensed practitioners.

Section 1157, by its express terms, is in no way limited to medical staff committees composed solely, or primarily, of physicians. Nor, as a practical matter, are physicians the only health care professionals qualified to

[5]We refer to the current edition of the AHA guidelines, published in 1979, since we deem the reference in title 22, section 70739, subdivision (a), to include superseding editions of the 1974 guidelines.

participate in the vital functions of such committees. Pursuant to the Hospital's medical staff bylaws, which are in accord with the standards of the JCAH, the infection control committee is clearly a "medical staff committee." We reject the contention that the fact that the committee is composed of a majority of personnel who are not physicians removes it for that reason alone from the ambit of section 1157.

## II.

█ Leary's argument that section 1157 protects only information pertaining to peer review by physicians is based upon case law holding that the section does protect such information, as well as what she deems to be "legislative history" of the section.

The California Supreme Court has not heretofore construed the scope of section 1157.[6] The earliest Court of Appeal decision involving the application of section 1157, which was enacted in 1968, is *Matchett* v. *Superior Court* (1974) 40 Cal.App.3d 623 [115 Cal.Rptr. 317], which discussed the statute's purpose as follows: "In an accredited hospital, the organized medical staff is responsible to the hospital governing body for the quality of in-hospital medical care; it evaluates the qualifications of applicants and holders of staff privileges; it recommends appointment, reappointment, curtailment and exclusion from staff privileges; it provides peer group methods for reviewing basic medical, surgical and obstetrical functions. (Accreditation Manual: Governing Body and Management, p. 6; Medical Staff, pp. 5-7; Medical Record Services, p. 3.) When medical staff committees bear delegated responsibility for the competence of staff practitioners, the quality of in-hospital medical care depends heavily upon the committee members' frankness in evaluating their associates' medical skills and their objectivity in regulating staff privileges. Although composed of volunteer professionals, these committees are affected with a strong element of public interest. [¶] California law recognizes this public interest by endowing the practitioner-members of hospital staff committees with a measure of immunity from damage claims arising from committee activities. (Civ. Code, § 43.7; *Ascherman* v. *San Francisco Medical Society* (1974) 39 Cal.App.3d 623 . . . .) Evidence Code section 1157 expresses a legislative judgment that the public interest in medical staff candor extends beyond damage immunity and requires a degree of confidentiality. It was enacted in 1968 in apparent response to this court's decision in *Kenney* v. *Superior Court*

---

[6]The Supreme Court on July 12, 1985 granted review in *West Covina Hospital* v. *Superior Court* (Cal.App.) (L.A. 32083). That case involves the question whether section 1157 prohibits a physician-member of a committee within its ambit from testifying voluntarily as to what occurred at a committee meeting. It appears to have no direct relevance to the issues presented in the instant case.

(1967) 255 Cal.App.2d 106 . . . . There we sustained a malpractice plaintiff's claim to discovery of hospital staff records which might reveal information bearing upon the competence of the defendant doctor. In *Kenney* only the doctor was a defendant, not the hospital. Nevertheless, a public policy question was raised by malpractice plaintiffs' access to medical files revealing committee investigations and appraisals of their peers. Section 1157 was enacted upon the theory that external access to peer investigations conducted by staff committees stifles candor and inhibits objectivity. It evinces a legislative judgment that the quality of in-hospital medical practice will be elevated by armoring staff inquiries with a measure of confidentiality." [Fn. omitted.] (*Matchett v. Superior Court, supra,* 40 Cal.App.3d 623, 628-629.)

The *Matchett* court also observed that "[t]his confidentiality exacts a social cost because it impairs malpractice plaintiffs' access to evidence. In a damage suit for in-hospital malpractice against doctor or hospital or both, unavailability of recorded evidence of incompetence might seriously jeopardize or even prevent the plaintiff's recovery. Section 1157 represents a legislative choice between competing public concerns. It embraces the goal of medical staff candor at the cost of impairing plaintiffs' access to evidence." (*Id.,* p. 629, fn. omitted.) In *Matchett,* the plaintiff had sought " 'personnel and/or staff file[s]' " of a doctor and files of various staff committees. (*Id.,* at p. 626.) The appellate court held that "the records and proceedings of these committees *reflecting inquiry* into the qualifications of [that doctor] are immune from discovery." (*Id.,* p. 631, italics added.)

Other decisions, citing *Matchett,* recognize that section 1157 is obviously intended to promote candor and objectivity in physician peer review. (See, e.g., *Snell v. Superior Court* (1984) 158 Cal.App.3d 44, 47 [204 Cal.Rptr. 200]; *West Covina Hospital v. Superior Court* (1984) 153 Cal.App.3d 134, 136 [200 Cal.Rptr. 162]; *Schulz v. Superior Court* (1977) 66 Cal.App.3d 440, 445 [136 Cal.Rptr. 67].)

While physician peer review records and proceedings are certainly within the protection of section 1157, nothing in the case law or the language of section 1157 limits its applicability to peer review of physicians by other physicians. Leary relies upon a statement in the chapter on quality assurance in the 1983 JCAH Manual which provides that the "evaluation of physician—directed care must be performed by physician members of the medical staff." (JCAH Manual, 1983, p. 152.) The context in which that provision appears is: "While the evaluation of physician—directed care must be performed by physician members of the medical staff, nonphysician health care professionals should assess those aspects of care that they provide. How-

ever, *the participation of both physicians and other health care profession-als in the same quality assessment activities, when appropriate, is strongly encouraged."* (*Ibid.*; italics added.) Furthermore, in the 1985 edition of the JCAH Manual the chapter on quality assurance has been completely revised and no longer contains the statement relied upon by Leary.

Our reading of both the 1983 and 1985 editions of the manual indicates that the JCAH standards clearly contemplate and approve the use of multi-disciplinary medical staff committees "having the responsibility of evalua-tion and improvement of the quality of care rendered in the hospital." Lear-y's contention that such committees are excluded from the coverage of sec-tion 1157 finds no support in the statute itself, the case law or the JCAH Manual.[7]

Having rejected Leary's arguments that the infection control committee cannot under any circumstances be a committee within the ambit of section 1157, we turn to the question whether the information sought to be discov-ered constitutes records and proceedings of that committee.[8]

### III.

During the discovery proceedings below, trial counsel for Leary argued, in effect, that the hospital was invoking section 1157 disingenuous-ly, because the discovery in issue did not involve statutorily protected rec-ords and proceedings and the resistance to discovery was in reality calcu-lated to frustrate Leary's rights under *Elam* v. *College Park Hospital, su-pra,* 132 Cal.App.3d 332. (The arguments of trial counsel on this point are set forth, *post,* at fn. 11.) The potential for conflict between *Elam* and

---

[7]Leary also contends that "legislative history" of section 1157 supports the view that it was intended to encompass only physician peer review activities. She relies upon letters sent to the Governor by counsel to the California Hospital Association and the author of the statute, urging signature on the bill enacting the legislation, as well as a letter to the Gov-ernor from the author of an amendment to section 1157. We agree with the Hospital that such letters are not admissible on the issue of legislative intent. (See *California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699-700 [170 Cal.Rptr. 817, 621 P.2d 856].) In any event, the letters do not support the view that section 1157 applies exclusively to physician peer review. We also reject Leary's suggestion that amend-ments to section 1157 and Civil Code section 43.7, which expanded their scope to include dental hygienists, veterinarians and dietitians, have any bearing on the issue before us.

[8]Leary urges that answers to deposition questions by a member of the committee cannot constitute "records or proceedings" or require testimony as to what transpired at a com-mittee meeting within the meaning of the statute. We agree with the Hospital that such answers, if they would divulge the nature or substance of the investigative or evaluative work of the committee, can constitute such records or proceedings. (Cf. *Mt. Diablo Hospital Medical Center* v. *Superior Court* (1984) 158 Cal.App.3d 344 [204 Cal.Rptr. 626] and *Henry Mayo Newhall Memorial Hosp.* v. *Superior Court* (1978) 81 Cal.App.3d 626 [146 Cal.Rptr. 542] [both involving answers to interrogatories].)

section 1157, which has been of increasing concern to the courts and to others,[9] warrants explanation.

*Elam,* which sets forth the duty of hospitals claimed to have been violated in this case, holds that "a hospital is accountable for negligently screening the competency of its medical staff to insure the adequacy of medical care rendered to patients at its facility." (*Id.,* at p. 346.) In reaching this result, the court observed that the proposition that a hospital may be held liable to a patient under the doctrine of corporate negligence has been utilized and expanded by the courts of several jurisdictions in order "to collectively impose upon a hospital a direct and independent responsibility to its patients of insuring the competency of its medical staff and the quality of medical care provided through the prudent selection, review and continuing evaluation of the physicians granted staff privileges." (*Ibid.*)

Section 1157 obstructs enforcement of *Elam* when it restricts access to evidence which may be necessary to prove that a defendant hospital has breached its duty to assure the quality of the medical care rendered within its walls. The impediment genuinely exists, however, only to the extent that a hospital may properly carry out the duty enunciated in *Elam* through its medical staff committees. The charge in this case, which is apparently not without precedent,[10] is that defendant hospital is relying on section 1157 as a subterfuge. Leary claims, in other words, that the hospital is asserting the bar of the statute with respect to information not within the exclusive province of the activities of a protected medical staff committee for the improper purpose of obstructing discovery of work actually undertaken by the hospital administration.[11]

---

[9]See, e.g., *Brown v. Superior Court* (1985) 168 Cal.App.3d 489, 493-495 [214 Cal.Rptr. 266]; *West Covina Hospital v. Superior Court, supra,* 153 Cal.App.3d 134, 138; *Mt. Diablo Hospital Medical Center v. Superior Court, supra,* 158 Cal.App.3d 344, 347; Denham & Geckle, *Who's Watching the Watchdog? Elam and California Evidence Code Section 1157* (1983) 18 U.S.F. L.Rev. 51; Loveridge & Kimball, *Hospital Corporate Negligence Comes to California: Questions in the Wake of Elam v. College Park Hospital* (1983) 14 Pacific L.J. 803; Comment, *Anatomy of the Conflict Between Medical Staff Peer Review Confidentiality and Medical Malpractice Plaintiff Recovery: A Case for Legislative Amendment* (1984) 24 Santa Clara L.Rev. 661.

[10]In *Brown v. Superior Court, supra,* 168 Cal.App.3d 489, as here, the plaintiff argued that the defendant hospital was using section 1157 simply to frustrate discovery in a suit alleging corporate negligence in violation of the duty described in *Elam.* Though denying the discovery sought, the trial judge apparently agreed, stating: "'I think it's a little on the outrageous side that all of the hospitals are no longer holding [information] in administrative files and [are] putting everything in those committees and everything is going there, but 1157 says that is privilege . . . . There is no question in the court's mind . . . that the hospitals are abusing 1157, but I can't do anything about that.'" (*Id.,* at p. 495.)

[11]The disagreement between the parties on this point is summed up in the following colloquoy between trial counsel, which occurred at the deposition of Nurse Vogler:

"Ms. GISVOLD [counsel for Leary]: Well, also, I think that the most recent case, which

Courts that have been called upon to apply section 1157 subsequent to the decision in *Elam* have declined to diminish the protection of the statute in order to accomodate the discovery needs of malpractice plaintiffs in suits against hospitals. In *West Covina Hospital* v. *Superior Court, supra,* 153 Cal.App.3d 134, a plaintiff in such a suit relied upon *Elam* in arguing, in effect, that the provision of section 1157 which does not immunize discovery from a medical staff committee of "statements made by any person in attendance at [a protected committee] meeting who is a party to an action or proceeding the subject matter of which was reviewed at such meeting" should be expansively construed so as to permit the discovery of certain committee records material to the issue whether the hospital negligently selected and reviewed the competence of staff physicians. The court agreed that discovery of the sought material would in all likelihood lead to very material and admissible evidence, but emphasized that "the Legislature has made the judgment call that an even more important societal interest is served by declaring such evidence 'off limits.'" (*Id.,* at p. 138.) Observing that nothing in *Elam* suggests a result contrary to that reached in the *Matchett* line of cases, and that the relevance of the records and proceedings of medical staff committees to show whether the hospital's conduct was negligent cannot serve to validate an otherwise unwarranted interpretation of the clear language of section 1157, the court barred discovery of the records in question, holding that the language in question was designed only to "permit discovery in suits by doctors claiming wrongful or arbitrary exclusion from hospital staff privileges. [Citations.]" (*Id.,* at p. 137.)

---

is *Elam*, has clearly given an indication that hospitals have an obligation separate from anything that the medical staff might do in order to assure the quality of medical care being provided to the patients. And that in order to do that, they must monitor separate from the medical staff the quality of medical care, and that is not privileged nor can it be kept privileged, and that certainly *Elam* supports a position that a patient has a right through proper discovery to find out what the hospital did to provide for the competence and quality of medical practice and nursing practice going on in the hospital.

"And to try to shield all of that by saying that each and everything that any person did because it ultimately at some point may flow back to an Infection Control Committee is therefore privileged from the time it started until the time that it got to the committee would produce an absolutely ludicrous position for patients and [make it] impossible to prove a case.

"You would have everything privileged essentially. Every laboratory report would be privileged. You would never get to have the lab report, you'd never get the pathology report because it went to the Tissue Committee—

"MR. SPAULDING [counsel for the hospital]: Well, my position is if a report is part of the patient's chart, certainly it's something that the patient will have access to. If on the other hand a document or a report or some activity is done by somebody who is on the Infection Control Committee and it is done for the Infection Control Committee, that's privileged under 1157.

"MS. GISVOLD: Well, it's also being done for the benefit of the hospital in terms of their monitoring the quality of medical care that is going on.

"MR. SPAULDING: Well, Evidence Code 1157 specifically addresses evaluation and improvement of the quality of care which I think is privileged.

"I'm instructing her not to answer questions in that regard."

In *Mt. Diablo Hospital Medical Center* v. *Superior Court, supra,* 158 Cal.App.3d 344, another division of this court "agree[d] with *West Covina* that the *Elam* decision has not diminished the protection provided by Evidence Code section 1157."[12] (*Id.,* at p. 347.)

We, too, agree with this proposition. However, while the discovery needs of malpractice plaintiffs seeking to impose liability under *Elam* does not justify reduction of the protection afforded by section 1157, neither do the interest of defendant hospitals in frustrating those needs justify enlargement of the protection provided. ■ Section 1157 "applies *only* to records of and proceedings before medical investigative committees." (*Schulz* v. *Superior Court, supra,* 66 Cal.App.3d at p. 446, italics added.) Information developed or obtained by hospital administrators or others which does not derive from an investigation into the quality of care or the evaluation thereof by a medical staff committee, and which does not disclose the investigative and evaluative activities of such a committee, is not rendered immune from discovery under section 1157 merely because it is later placed in the possession of a medical staff committee or made known to committee members; and this may be so even if the information in question may be relevant in a general way to the investigative and evaluative functions of the committee. Just as " 'a party cannot [under the attorney-client privilege] conceal a fact merely by revealing it to his lawyer' " (*Upjohn Co.* v. *United States* (1980) 449 U.S. 383, 396 [66 L.Ed.2d 584, 595, 101 S.Ct. 677], quoting *State* ex rel. *Dudek* v. *Circuit Court* (1967) 34 Wis.2d 559, 580 [150 N.W.2d 387, 399, 35 A.L.R.3d 377]; accord, *D. I. Chadbourne, Inc.* v. *Superior Court* (1964) 60 Cal.2d 723, 732 [36 Cal.Rptr. 468, 388 P.2d 700] ["that which was not privileged in the first instance may not be made so merely by subsequent delivery to the attorney."]), a hospital cannot render its files immune from discovery simply by disclosing them to a medical staff committee. Hospital administrators cannot, in other words, evade their concurrent duty to insure the adequacy of medical care provided patients at their facility—the duty articulated in *Elam*—simply by purporting to have delegated that entire responsibility to medical staff committees. The responsibilities of hospital administrators pertaining to the quality of in-hospital care will, of course, usually be related to the similar duties of medical staff committees. Nonetheless, the responsibilities of hospital administrators are independent of those resting with medical staff committees.

The *Elam* court, in imposing upon a hospital the duty to insure the competence of its medical staff through careful selection and review, discussed

---

[12]The trial court in *Mt. Diablo* had permitted discovery on the ground that " '*Elam* v. *College Park Hospital,* 132 Cal.App.3d 332 would be meaningless unless reasonable discovery is allowed. Since *Elam* was decided after [section 1157] became law, in the face of [section 1157], the *Elam* decision must be given some depth.' " (*Mt. Diablo Hospital, supra,* 158 Cal.App.3d at p. 346.)

the general "independent responsibility" of a hospital as an institution, as opposed to the responsibility of its medical staff. "[O]ur conclusion is consonant with the public's perception of the modern hospital as a multifaceted, health-care facility responsible for the quality of medical care and treatment rendered. The community hospital has evolved into a corporate institution, assuming 'the role of a comprehensive health center ultimately responsible for arranging and coordinating total health care' . . . . 'Certainly, the person who avails himself of our modern "hospital facilities" (frequently a medical teaching institution) expects that the hospital staff will do all it reasonably can to cure him and does not anticipate that its nurses, doctors and other employees will be acting solely on their own responsibility.'" (*Elam* v. *College Park Hospital, supra,* 132 Cal.App.3d 332, 344-345.)

■ With respect to infection control specifically, the California Administrative Code, the JCAH Manual and the AHA guidelines[13] all clearly demonstrate that the hospital administration has independent duties and responsibilities apart from those of an infection control committee. Essentially, the hospital as a corporate entity must establish and implement an adequate infection control program, while the duty of the committee is to monitor the effectiveness of that program.

California Administrative Code, title 22, section 70739, subdivision (a), requires that a "written hospital infection control program" be adopted by all general acute care hospitals in this state.[14]

The JCAH Manual likewise requires accredited hospitals to establish "an active hospitalwide infection control program." (JCAH Manual, 1985,

---

[13]As noted in *Matchett* v. *Superior Court, supra,* 40 Cal.App.3d 623, we are authorized by Evidence Code section 452, subdivision (h), "to take judicial notice of nationwide, generally accepted standards [such as those promulgated by the JCAH and the AHA] describing the organization and functions of medical staffs and medical staff committees in accredited hospitals." (*Id.,* at p. 627, fn. omitted.)

[14]Section 70739, subdivisions (b) through (e), which prescribes the sort of program that must be adopted, provides:
"Infection Control Program
". . . . . . . . . . . . . . . . . . . .
"(b) The system for reporting infections shall include and identify infections which are:
"(1) Evident at the time of admission to the hospital.
"(2) Possibly acquired and evident during hospitalization.
"(3) Possibly acquired during hospitalization and evident following discharge from the hospital.
"(c) Activities of the program shall include concurrent surveillance of patients and staff, prevention techniques, treatment and reporting of infections.
"(d) Hospitals having a licensed bed capacity of 200 or more shall have a full-time infection control employee who shall coordinate the activities of the program.
"(e) Hospitals having a licensed bed capacity of 199 or less shall have a designated part-time infection control employee who shall coordinate activities of the program."

p. 51.) Moreover, the JCAH Manual clearly distinguishes between the responsibility of the hospital administration to establish and operate such a program and the responsibility of the infection control committee to evaluate the effectiveness of that program. Thus, for example, the manual provides that: "[r]esponsibility for *monitoring* the infection control program shall be vested in a multidisciplinary committee. The committee shall recommend corrective action based on records and reports of infections and infection potentials among patients and hospital personnel." (*Id.,* at p. 52, italics added.)

The AHA guidelines similarly distinguish between the duties of hospital administrators and those of the infection control committee.[15] After setting forth various recommendations as to the responsibilities of the infection control committee, which are described as consistent with those of the JCAH (AHA guidelines at pp. 22-23), the AHA guidelines emphasize that "[p]revention and control of nosocomial infection demands more than the existence of an active infection control committee and an informed and conscientious staff. . . . The health care institution *as an entity* has an overall responsibility for assessment, prevention, and control of infection within its premises." (AHA guidelines, p. 45, italics added.) In this connection, the guidelines urge the establishment "within a hospital administration" of the position of infection control nurse.[16] (*Id.,* at p. 49.)

The foregoing duties of hospital administrators show that medical staff committees are not alone responsible for infection control and that administrators cannot abdicate their concomitant responsibility in this regard. The sharing of such responsibility does not bring hospital administrators within the protections of a statute which, by its terms, only applies to the records and proceedings of medical staff committees.

As the case law demonstrates, section 1157 does not shield from discovery administrative activities which, while related to, are independent of the investigative and evaluative activities of medical staff committees. "The medical staff immunity described in section 1157 . . . does not embrace the files of the hospital administration (as distinguished from staff)." (*Matchett* v. *Superior Court, supra,* 40 Cal.App.3d 623, 628; accord *Brown* v. *Superior Court, supra,* 168 Cal.App.3d 489, 501; *Saddleback Community Hospital* v. *Superior Court* (1984) 158 Cal.App.3d 206, 208-209 [204

---

[15]The AHA guidelines, "Infection Control in the Hospital," actually comprise an entire book devoted to the subject of infection control. For obvious reasons, we make reference here only to those portions of the guidelines which we deem particularly pertinent to the issues before us.

[16]As previously noted (*ante,* fn. 14.) California law requires that hospitals have an infection control employee. (Cal. Admin. Code, tit. 22, § 70739, subds. (d) and (e).)

Cal.Rptr. 598]; *Snell* v. *Superior Court, supra,* 158 Cal.App.3d 44, 49; *Schulz* v. *Superior Court, supra,* 66 Cal.App.3d 440, 446-447.)

In light of the purposes of civil discovery, one of which is "to give greater assistance to the parties in ascertaining the truth," (*Greyhound Corp.* v. *Superior Court* (1961) 56 Cal.2d 355, 376 [15 Cal.Rptr. 90, 364 P.2d 266]) liberality in allowing discovery is ordinarily the rule. (*Davies* v. *Superior Court* (1984) 36 Cal.3d 291, 300 [204 Cal.Rptr. 154, 682 P.2d 349]; *Chronicle Pub. Co.* v. *Superior Court* (1960) 54 Cal.2d 548, 560 [7 Cal.Rptr. 109, 354 P.2d 637].) ■ In this connection, the party claiming immunity from discovery carries the burden of showing that the evidence it seeks to suppress is within the terms of the statute it relies upon. (*Brown* v. *Superior Court, supra,* 168 Cal.App.3d at pp. 500-501; accord, *Matchett* v. *Superior Court, supra,* 40 Cal.App.3d at p. 627; *Sierra Vista Hospital* v. *Superior Court* (1967) 248 Cal.App.2d 359, 365 [56 Cal.Rptr. 387].) Thus, a hospital cannot receive the benefit of section 1157 if it refuses to bear the associated burden of demonstrating why the information claimed to be immune should be deemed a record or proceeding of a medical staff committee.

■ Certain types of information are so clearly within the exclusive sphere of a protected medical staff committee—such as, for example, the infection control committee's self-generated analysis of the adequacy of work performed by hospital staff members engaged in infection control or of procedures utilized by them—that section 1157 can be found applicable without extensive judicial inquiry. ■ On the other hand, when the information sought to be discovered relates to a matter that is not obviously within the sole purview of a protected committee—such as, for example, the nature of the infection control program administratively established in the hospital—the burden of showing that it is protected by section 1157 cannot be sustained except upon particularized judicial inquiry. The need for such inquiry is not eliminated by the fact that the person from whom discovery is sought is a member of a medical staff committee. Neither the language of the statute nor the pertinent case law suggests that information possessed by or available to a hospital administrator, physician or other health care professional is necessarily immune from discovery simply because, like Nurse Vogler, he or she serves part-time as a member of a protected committee. Thus, when application of the statute to disputed discovery is not facially apparent, as will often be the case, the burden on the party resisting discovery ordinarily cannot be sustained except upon judicial inquiry into the pertinent facts at an *in camera* hearing. (See *Saddleback Community Hospital* v. *Superior Court, supra,* 158 Cal.App.3d 206, 209; *Henry Mayo Newhall Memorial Hosp.* v. *Superior Court, supra,* 81 Cal.App.3d 626, 636-637; *Schultz* v. *Superior Court, supra,* 66 Cal.App.3d

440, 446-447.) If it is revealed at such a hearing that only portions of a report or other document are derived from the work of a protected committee the court may order such portions excised and compel disclosure of the remainder. (*County of Kern* v. *Superior Court* (1978) 82 Cal.App.3d 396, 402 [147 Cal.Rptr. 248].)

In the present case the trial court granted real party in interest's motion to compel answers without sufficient inquiry into relevant considerations. For this reason, and because the record does not otherwise provide a factual basis upon which we can determine the application of section 1157, we remand the case for further proceedings. In order to assist the trial court and the parties, we think it appropriate to identify some of the relevant factors that should guide the trial court's determination.

Of the 18 deposition questions in issue, only one *explicitly* solicited information regarding activities of the infection control committee: "Has Victoria Leary's care and treatment ever been reviewed by the Infection Control Committee?" At first blush it might seem that a party resisting discovery on the basis of section 1157, and which therefore has the burden of affirmatively showing that the information sought constitutes a record or proceeding of a protected committee, cannot refuse to disclose whether the information has been reviewed by such a committee. However, the matter is not so simple. In *Brown* v. *Superior Court, supra,* 168 Cal.App.3d 489, the court addressed the question, among others, whether the plaintiff in a malpractice action against a hospital and an attending physician can discover the fact of evaluation or nonevaluation of the physician by a medical staff committee of the hospital. After analysis of the case law, the court concluded "that a medical malpractice plaintiff should be able to discover whether or not defendant Hospital evaluated its physicians. This result stimulates the evaluation process without permitting penetration of the content of committee discussions. It is our view that such information does not constitute either 'proceedings' or 'records' under the policy the Legislature has evidenced in enacting section 1157. [¶] To be sure, permitting a 'yes' or 'no' answer to a question directed to the fact of evaluation only encourages hospitals to conduct evaluations. If no evaluation has occurred, there is nothing to protect under section 1157; and petitioner acquires information that may be valuable in her lawsuit against Hospital. [Citation.] If an evaluation has occurred, section 1157 protects the committees and hospital from further disclosure." (*Id.,* at pp. 501-502, fn. omitted.)

The *Brown* court also held, however, that the defendant hospital need not disclose whether the records of a particular patient had been reviewed by the records committee. (168 Cal.App.3d at pp. 496-497.) Although the opinion provides no rationale for the distinction between the fact of evalu-

ation or nonevaluation of the care provided by a physician and the fact of evaluation or nonevaluation of the care received by a patient, it may be assumed that only the latter was viewed as in itself prejudicial and therefore within the protection of the statute. Unlike periodic review of the performance of staff physicians, which is a conventional committee practice not indicative of impropriety, the care received by a particular patient may be reviewed by certain committees only in the event the committee suspects a dereliction. It follows that disclosure of the fact of committee evaluation of the competence of a particular physician is not prejudicial, whereas the disclosure that a particular patient's care had been investigated or evaluated might of itself be prejudicial and therefore inhibit the candor and objectivity of the committee discussion.

Applying this reasoning to the present case, the hospital should be required to disclose whether Leary's care and treatment has been reviewed by the infection control committee *unless* it can show that such review would not be undertaken as a matter of course and that disclosure of the fact of review would be prejudicial to an interest protected by section 1157. If the committee regularly reviews the care and treatment of all or of randomly selected patients, or if review is otherwise automatically undertaken (as, for example, upon request of the patient or his or her physician), the mere fact of committee review would not constitute a record or proceeding of that committee.

If, after appropriate inquiry, the trial court determines that the fact of review or nonreview of Leary's care and treatment by the infection control committee is not immune from discovery and must be disclosed, and if Nurse Vogler discloses that respondent's care and treatment has not been reviewed by the infection control committee, it would appear that the information sought by the remaining deposition questions relative to Leary's care and treatment could not constitute records and proceedings of that committee and must also be disclosed. This does not mean, however, that a trial court determination that the fact of committee review of Leary's care and treatment is immune from discovery, or the disclosure that the committee has reviewed her care and treatment, would necessarily operate to immunize the additional information sought regarding Leary's treatment.

The remaining 17 deposition questions put to Nurse Vogler do not on their face appear to solicit information that would necessarily be developed or reviewed only by the infection control committee. Nor does it appear from the face of the questions that the information sought would not be known by a nurse epidemiologist employed by the hospital from sources entirely independent of the medical staff committee of which she is a member. While it would seem that a nurse epidemiologist, whether or not a

member of the infection control committee, would have some knowledge of infections contracted at the hospital at which she or he is employed, the record in this case does not sufficiently disclose the nature of Nurse Vogler's responsibilities and the extent to which she is or should be independently informed on the matters about which she was questioned.

Vogler testified at her deposition that in her employment as nurse epidemiologist she is directly responsible to the president of the hospital. She also testified, however, that anything she does goes through the infection control committee "in a policy way." Although Vogler has a written job description, she could not recall its exact provisions. She stated that her job essentially had to do with education, surveillance and participation on the infection control committee. She annually provides classes on infection control to all departments in the hospital; she advises and consults with the nursing department; she receives daily reports of all positive cultures from the laboratory and reviews patient charts to determine whether an infection was hospital-acquired (nosocomial) or community-acquired; and she prepares monthly reports, which are provided to the infection control committee and portions of which are provided to the hospital administrator and the director of nursing, setting forth the number of infections broken down by site of infection, organism and location of the patient.

The trial court must explore and determine the extent to which Vogler's responsibilities as nurse epidemiologist may be independent of her participation in activities of the infection control committee. Since the immunity afforded by section 1157 applies only to records and proceedings, not to persons, it cannot be invoked by the hospital simply because Nurse Vogler is a member of a committee whose records and proceedings are protected by the statute.

Let a peremptory writ of mandate issue directing the superior court to vacate its order and reconsider real party in interest's discovery motion consistent with the views expressed in this opinion.

Rouse, J., and Smith, J., concurred.