[No. B056780. Second Dist., Div. Seven. Sept. 24, 1991.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
MEMORIAL MEDICAL CENTER OF LONG BEACH, Real Party in
Interest.

[No. B057129. Second Dist., Div. Seven. Sept. 24, 1991.]

MEMORIAL MEDICAL CENTER OF LONG BEACH, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

366

COUNSEL

Ira Reiner, District Attorney, Harry B. Sondheim and Brentford J. Ferreira, Deputy District Attorneys, for Petitioner in No. B056780 and Real Party in Interest in No. B057129.

No appearance for Respondent.

Weissburg & Aronson, Jay Hartz, Kenneth M. Stern and Robert C. Leventhal for Real Party in Interest in No. B056780 and Petitioner in No. B057129.

OPINION

JOHNSON, J.—

### FACTS AND PROCEEDINGS BELOW

The District Attorney of Los Angeles County, representing petitioner, the People of the State of California (hereinafter referred to as the People), seeks a writ of mandate to compel the Los Angeles County Superior Court to vacate its order of February 1, 1991. In that order the trial court, in response to a motion in opposition to the issuance of a search warrant brought by Memorial Medical Center of Long Beach (hereinafter referred to as Memorial), modified the People's original statement of property to be seized.

Cross-petitioner Memorial seeks a peremptory writ of mandate ordering the trial court to set aside its order of February 20, 1991, which issued a modified search warrant. Memorial alleges that the property sought under the modified warrant is protected from discovery, and therefore the trial court abused its discretion in issuing the order.

The People endeavor to gain access to a number of documents relevant to an investigation arising from two separate incidents of possible criminally negligent behavior by a physician, Dr. Larry Igor Borden. As related in the People's statement of probable cause, the first incident, occurring on August 8, 1984, resulted in the death of a six-week-old baby during surgery for a hernia. Dr. Borden was the anesthesiologist during the surgery; approximately 15 minutes after the administration of a general anesthetic the infant developed an irregular heartbeat and low blood pressure. Without informing the surgeon, Dr. Borden then placed the patient on 100 percent oxygen for the remainder of the procedure while the surgeon attempted emergency measures to relieve the irregular heartbeat. The surgery then progressed; after completion Dr. Borden could not bring the patient back to consciousness. The infant never regained consciousness and died on August 22, 1984.

An autopsy revealed the infant's cause of death was lack of oxygen to the brain. It was later determined by investigations made by the surgical staff that Dr. Borden had "over gassed" the patient, and had failed to notify the surgeon that he had placed the child on pure oxygen. Since the child did not show any sign of pain during surgery although she was not receiving anesthetic, Dr. Borden should have realized the seriousness of the child's condition and informed the surgeon immediately so that surgery could be stopped and resuscitation attempted. According to the statements of two anesthesia experts, Dr. Borden's failure to notify the attending surgeon of each of these facts constituted gross negligence. The file on this patient was transferred to the California Attorney General's Office, where an administrative hearing regarding suspension or revocation of Dr. Borden's license is pending.

The second incident involving Dr. Borden occurred on July 18, 1989. A 68-year-old patient, admitted to the hospital for coronary bypass surgery, began to experience irregular heartbeat and low blood pressure shortly after administration of anesthetic by Dr. Borden. The attending surgeon stopped his scrubbing and immediately began CPR on the patient. Pursuant to the

standard duties of an anesthesiologist, Dr. Borden had placed an endotracheal tube within the patient's airway to assure that the patient received oxygen while under the anesthetic. Upon asking Dr. Borden whether the patient was receiving adequate oxygen, the surgeon received an affirmative response. The surgeon, relying on the accuracy of this statement, attributed the complications to the patient's heart condition and opened the patient's chest to put him on heart bypass. When the surgeon opened the patient's chest cavity he noticed very dark blood, indicating lack of oxygen, and again asked Dr. Borden if the patient was receiving oxygen. Dr. Borden again responded positively. After placing the patient on a heart bypass machine, about 20 minutes after the onset of the emergency, the surgeon asked Dr. Borden to inflate the patient's lungs. When Dr. Borden attempted to do so, the patient's stomach became distended instead, indicating that the endotracheal tube had been misplaced into the esophagus rather than the trachea. Therefore, the patient had not received any oxygen for over 20 minutes.

The patient never regained consciousness and died of cerebral hypoxia, or lack of oxygen to the brain, on July 20, 1989. According to the two anesthesiology experts, one of the main responsibilities of an anesthesiologist during surgery is to maintain a patient's airway. In order to do so, the anesthesiologist must ensure that the endotracheal tube is properly placed. Upon learning of the signs of hypoxia, Dr. Borden failed to check his placement of the endotracheal tube. Moreover, even when asked twice by the attending surgeon if the patient was being properly oxygenated, Dr. Borden did not correct his placement of the tube. In the experts' view Dr. Borden acted with gross negligence in not checking the placement of the tube when the emergency began. Even worse in the experts' judgment was Dr. Borden's nonresponsiveness to express inquiries by the attending surgeon. Moreover, even if Dr. Borden had checked his placement of the tube and failed to recognize the misplacement, this would also be a gross breach of the standard of care to which an anesthesiologist is held.

According to their statement of probable cause, the People have been informed that several of Memorial's peer review committees have reviewed the two incidents in question. Furthermore, in a 1986 interview with the affiant, an investigator with the California Medical Board, Dr. Borden stated that he had voluntarily restricted his practice after the first incident after being asked by his colleagues not to administer anesthesia to children under one year of age. In addition, Memorial assertedly has a credentials file for each physician having privileges at the hospital, including Dr. Borden.

It is the People's desire to have access to Memorial's files regarding Dr. Borden which is the focal point of this action.[1] In a special proceeding the People produced an affidavit and statement of probable cause which they sought to use to obtain a search warrant for these documents. The People declare that the documents are necessary to establish that Dr. Borden acted with criminal negligence or implied malice. At this time criminal charges have not been filed against Dr. Borden.

Memorial opposed the issuance of a search warrant, invoking Evidence Code section 1157,[2,3] which protects the "proceedings" or "records of organized committees" of hospital medical staffs or peer review bodies from "discovery." Memorial argued that the protections of section 1157 apply to documents sought under a search warrant as well as under the tools of civil discovery.

The People responded to Memorial's opposition to the issuance of the warrant first by noting the lack of support in the case law for Memorial's assertion that section 1157 is applicable to criminal actions. Further indicating this lack of support was the absence of any language in the legislative history which explicitly includes criminal actions within the protections of section 1157.

---

[1]The documents originally sought by the People in their statement of property to be seized were:

(1) Memorial's credentials file on Dr. Borden, comprising (a) his application for hospital privileges; (b) documents received by Memorial as part of the investigation into Dr. Borden's application; (c) a list of privileges granted including any restricted or denied privileges; (d) letters from Memorial to Dr. Borden regarding the status of requests for privileges, notification of any investigation of Dr. Borden's patient care and the reasons for the investigation, notification concerning limitations on or loss of previously granted privileges and the reasons for such limitations, notification of restoration of any privileges once withheld or restricted; and (e) responses to these letters from Dr. Borden to Memorial.

(2) Any reports made to or by Memorial's peer review committees which reviewed Dr. Borden's involvement in the two incidents at issue.

(3) Any report filed by Memorial pursuant to Business and Professions Code section 805 regarding Dr. Borden.

[2]Unless otherwise indicated, all statutory references are to the Evidence Code.

[3]Section 1157 reads in relevant part:

"(a) Neither the proceedings nor the records of organized committees of medical, medical-dental, podiatric, registered dietician, psychological, or veterinary staffs in hospitals, or of a peer review body, as defined in Section 805 of the Business and Professions Code, having the responsibility of evaluation and improvement of the quality of care rendered in the hospital, or for that peer review body . . . shall be subject to discovery.

". . . . . . . . . . . . . . . . . . . . .

"(e) The amendments made to this section by Chapter 1081 of the Statutes of 1983, or at the 1985 portion of the 1985-86 Regular Session of the Legislature, or at the 1990 portion of the 1989-90 Regular Session of the Legislature, do not exclude the discovery or use of relevant evidence in a criminal action."

In ruling on the People's request for a search warrant the trial court first held that since the Evidence Code is applicable both to criminal and civil courts, section 1157 was meant to apply to criminal as well as civil actions. In support of its holding the court cited section 1157, subdivision (e), which contains language regarding specific amendments to section 1157 enacted since 1983. Section 1157, subdivision (e) provides these amendments explicitly exempt criminal action from the proscription on the discovery and use of "relevant evidence." The court found section 1157, subdivision (e) is meant to apply only to the clauses of section 1157 which were added by these amendments. Further, the court found section 1157, subdivision (e) is necessary only to indicate a distinction between the scope of immunity granted by the provisions of the statute enacted prior to 1983, and the subject matter of the mentioned amendments, added since 1983. The effect of this different treatment, according to the trial court, makes the former material immune from, and the latter material subject to, criminal discovery.

However, the trial court found resolution of this first point did not automatically impose a blanket bar to the People's access to the documents they sought from Memorial. Rather, the court found the meaning of the terms "proceedings" and "records of organized committees" was not obvious on the face of section 1157, and each document should be considered separately to determine whether it fell within the protections of the statute.

The court interpreted "proceedings" and "records" to mean "specifically the evaluation process that the committees of the hospital undergo in order to determine whether physicians should be accredited." Pursuant to this interpretation, the court modified the list of documents enumerated in the search warrant to exclude those which it decided were protected under section 1157. At the same time the court received Memorial's entire file regarding Dr. Borden in camera and executed the modified search warrant. Enforcement of the warrant was stayed, and the documents in question remain under seal pending the outcome of this action.

The People do not dispute that records and proceedings of hospital peer review committees have always been included within the section 1157 umbrella. They assert, however, it is the Legislature's intention the documents of such committees no longer be protected from access in a criminal investigation. The People point to the language of section 1157, subdivision (e), which states: "The amendments made to this section by Chapter 1081 of the Statutes of 1983, or at the 1985 portion of the 1985-86 Regular Session of the Legislature, or at the 1990 portion of the 1989-90 Regular Session of

the Legislature, do not exclude the discovery or use of relevant evidence in a criminal action."

According to the People, because the documents in question are those of a committee of a "peer review body, as defined in Section 805 of the Business and Professions Code," (Evid. Code, § 1157, subd. (a)), and this language was an amendment to section 1157 added by chapter 196 of the Statutes of 1990, subdivision (e) precludes excluding these documents from seizure under a search warrant.

We reject this argument. However, because we hold section 1157 does not apply to property sought under a properly issued search warrant, we grant the People's petition for a writ of mandate. For the same reason we reject Memorial's petition for a writ of mandate.

DISCUSSION

I. SECTION 1157 DOES NOT APPLY TO CRIMINAL ACTIONS

> A. *Section 1157 Represents a Balance Between Two Competing Policy Goals*

■ Section 1157 specifies the records and proceedings of certain committees within health care facilities or societies are immune from discovery provided they are responsible for evaluating and improving the quality of medical care. When originally enacted in 1968, section 1157 provided protection solely to committees of medical staffs in hospitals, or committees of local medical societies. (Stats. 1968, ch. 1122, p. 2138; see also *Matchett v. Superior Court* (1974) 40 Cal.App.3d 623, 626, fn. 1 [115 Cal.Rptr. 317].) Since that time section 1157 has been amended a number of times, and now extends its protection to committees of medical-dental, podiatric, dietician, psychological, or veterinary staffs, peer review bodies, and analogous societies.

The social goal which section 1157 is intended to further was best explained in the seminal case of *Matchett v. Superior Court, supra,* 40 Cal.App.3d 623: "Section 1157 represents a legislative choice between competing public concerns. It embraces the goal of medical staff candor at the cost of impairing *plaintiff's* access to evidence." (*Id.* at p. 629, italics added.) Hospital peer review committees are responsible for evaluating the qualifications of applicants for staff privileges, recommending appointment, curtailment or exclusion of staff privileges, and reviewing medical practices

within the health care facility. The maintenance of high medical standards depends on the effectiveness of the oversight of such committees, and thus on the accuracy of the information which the committees can obtain concerning the operations of the facility with which they are affiliated. Moreover, it is crucial the committees be made up of health care professionals of the highest possible qualifications.

Thus, peer review committees serve two critical functions: first, they provide the health care community with a method of self-policing. In this way they assure that methods and procedures which have been proven to be most effective may become standardized within the health care facility, thereby improving efficiency. Second, the peer review process serves the important social interest in public health and safety by continually scrutinizing medical and health care operations in order to correct any potential problems with procedure or staff which might threaten the individual patient with disproportionate risk of danger.

Because of this latter role as a quasi-public functionary, California law has granted peer review committees immunity from liability for certain actions arising from committee activities. (See Civ. Code, § 43.7) Apparently in the same spirit,[4] in passing section 1157 the Legislature apparently believed the quality of medical care depends in large part on the committee members' candor in evaluating their colleagues' skills honestly and objectively. They concluded that external access to the records of a peer committee would tend to inhibit the free flow of information arising from such candor. Hence, section 1157 is an attempt to prevent a chilling effect on the accurate evaluation of health care facilities which would lead to a decline in the quality of health care in California.

In balancing a plaintiff's concern in obtaining access to peer review committee records versus the public interest in a high-quality health care system, the Legislature drew a distinction between the rights of the individual, and the rights of the many. The confidentiality bestowed by section 1157, then, has its price: it denies a plaintiff access to information which could prevent her from recovering in a case against a physician. Yet it is clearly the judgment of the Legislature that this price is worth paying in order to protect the prospective health of the public as a whole.

---

[4] An indication of the similarity of the social considerations giving rise to section 1157 and section 43.7 of the Civil Code is demonstrated by noting a significant portion of Civil Code section 43.7, dealing with physician immunity from civil liability, was enacted in the same bill, Assembly Bill No. 463 (Stat. 1983, ch. 1081), which added podiatric and dietician staffs to be included within the protections of section 1157. The same bill also added subdivision (e) to the text of section 1157.

The present case is one of first impression. It presents a weighing of different interests than hypothesized above. For here we are essentially asked to determine whether in enacting section 1157 the Legislature also intended to balance the same concern in public safety and health against itself. The goal of section 1157, improved health care, is on one side of the equation, and the threat of unfettered criminal activity is on the other. Because the public policy considerations involved in such a balance are intrinsically distinct from those involving the private rights of an individual plaintiff, we must first look to the statutory language to discover whether the Legislature intended the effect of section 1157 to be the same in criminal as in civil cases.

### B. *The Language of the Contested Parts of Section 1157 Is Facially Ambiguous*

The dispute in this case arises from a disagreement as to the meaning of a part of section 1157; the intended purpose of subdivision (e). Hence our first inquiry must be as to the "four corners" of section 1157 itself, for "[w]hen statutory language is clear and unambiguous, there is no need for construction, and courts should not indulge in it." (*East Penninsula Ed. Council, Inc.* v. *Palos Verdes Penninsula Unified School Dist.* (1989) 210 Cal.App.3d 155, 166 [258 Cal.Rptr. 147].)

Section 1157, subdivision (e) refers to the amendments to section 1157 made in 1983, 1985, and 1990, and states the amendments "do not exclude the discovery or use of relevant evidence in a criminal action." The meaning of this phrase may be understood in two different ways. In the first sense, subdivision (e) states the subject matter of the amendments, that is, health care specialists given protection as a result of these amendments, is not given protection from "discovery or use of relevant evidence in a criminal action." This is the sense in which Memorial wishes us to understand this language, the meaning that the trial court gave it, and facially is a plausible reading of the language. Understood in this way, one is led to the inevitable question: why did the Legislature expressly preclude the amendments from protection in a criminal action unless it was to contrast the protection provided the organizations mentioned in the pre-1983 portion of the statute with that supplied after 1983? This contrast can mean nothing unless it means that before 1983 the statute gave protection against civil and criminal discovery, and after 1983 limited the protection to civil discovery, as stated.

However, we think there is another way in which section 1157, subdivision (e) may be understood. The words "do not exclude" could serve to

preempt an anticipated attack on the statute on the basis the amendments somehow precluded discovery in a criminal action. In other words, section 1157, subdivision (e) could mean that the amendments added from 1983 to 1990 *do not alter the original meaning* of the statute by adding an immunity from criminal discovery.

Interpreting section 1157, subdivision (e) in this way still makes it necessary to ask why the Legislature would have needed to add subsection (e) at all. The answer lies in the passage of proposition 8, the "Victim's Bill of Rights," in 1980. Upon passage, Proposition 8 amended the California Constitution by adding the following to article I, section 28: "d) Right to Truth-in-Evidence. Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding, including pretrial and post conviction motions and hearings. . . . Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay. . . ." (Cal. Const., art. I, § 28, subd. (d).) Hence, the addition of subdivision (e) to section 1157 may have been intended to forestall any possible contention the post-1980 amendments, which were passed by a two-thirds vote of each house, sought to exclude evidence relevant in a criminal proceeding from discovery, as provided for in Proposition 8.[5] No such clarification would have been required of the pre-1980 statute, since Proposition 8 does not apply retrospectively.

Because we find section 1157, subdivision (e) is capable of having two distinct and conflicting meanings, we find it facially ambiguous, and susceptible to the rules of statutory construction.

### C. *The Legislature Did Not Intend That Section 1157 Apply to Criminal Discovery.*

Section 1157 was added to the Evidence Code in 1968 by Assembly Bill No. 1069, authored by Assemblyman Versey. The bill was only amended three times before passage. All three amendments concerned the language defining those groups whose records and proceedings were to be protected under the section; there was no change made in the portion of the bill providing these groups "shall [not] be subject to discovery." (See Assem.

---

[5]Significantly, all of the post-1980 amendments to section 1157 were passed by greater than a two-thirds majority of each house of the Legislature. Thus, the language of subsection (e) may easily be interpreted as a clarification that, although the supermajority vote required for exclusion of relevant evidence in a criminal action under Proposition 8 was present, such an expansion of the protections of section 1157 was not intended in any of the amendments' passage.

Bill No. 1069 (1968 Reg. Sess.) § 1, introduced Mar. 19, 1968, amended by the Assem., June 12, 1968, further amended by the Assem., June 26, 1968, further amended by the Assem., July 12, 1968, approved by the Governor, Aug. 8, 1968.) This suggests the Legislature had few differences over what was meant by the word "discovery," and was more concerned with the breadth of the protections supplied by the bill. The relative rapidity with which the bill made it through the Assembly, and the lack of apparent discussion in the Senate suggest either that the bill was considered unimportant and trivial in its effect, or that the legislators felt a nearly universal sense of urgency regarding the passage of this bill.

The magnitude of the foreseeable effects section 1157 would have on health care providers dissuade us from believing the Legislature could have thought this was a trivial bill. Moreover, as stated in *Matchett* v. *Superior Court* (*supra*, 40 Cal.App.3d 623), section 1157 "was enacted in apparent response to this court's decision in *Kenney* v. *Superior Court* (1967) 255 Cal.App.2d 106. There we sustained a *malpractice plaintiff's* claim to hospital staff records. . . ." (*Id.* at p. 629, italics added.)

The opinion section 1157 was enacted in response to a threatened harm to the public interest posed by *Kenney* v. *Superior Court* (1967) 255 Cal.App.2d 106 [63 Cal.Rptr. 84] has been echoed by the majority of the courts which have considered section 1157. (See, e.g. *West Covina Hospital* v. *Superior Court* (1986) 41 Cal.3d 846, 853 [226 Cal.Rptr. 132, 718 P.2d 119, 60 A.L.R.4th 1257] (quoting *Matchett* v. *Superior Court, supra*, 40 Cal.App.3d 623); *Hinson* v. *Clairemont Community Hospital* (1990) 218 Cal.App.3d 1110, 1127 [267 Cal.Rptr. 503]; *California Eye Institute* v. *Superior Court* (1989) 215 Cal.App.3d 1477, 1483 [264 Cal.Rptr. 83]; *County of San Diego* v. *Superior Court* (1986) 176 Cal.App.3d 1009 [222 Cal.Rptr. 484]; *Santa Rosa Memorial Hospital* v. *Superior Court* (1985) 174 Cal.App.3d 711, 719-720 [220 Cal.Rptr. 236]; *Schulz* v. *Superior Court* (1977) 66 Cal.App.3d 440, 445 [136 Cal.Rptr. 67] [quoting *Matchett* v. *Superior Court, supra*, 40 Cal.App.3d 623].)

This court joins those courts in concluding it is reasonable to believe section 1157 was enacted as a remedy to situations similar to that found in *Kenney*; malpractice actions in which the records of hospital peer review committees or staff committees are sought. The fact the portion of section 1157 relating to "discovery" was never amended while in committee, combined with the speed of the bill's passage, leads to the implication the Legislature knew exactly what was meant by the term, and considered it obvious enough not to warrant discussion. This implication was not lost on the *Matchett* court, which found "[t]he statute, then, *is aimed directly at*

*malpractice actions* in which a present or former hospital staff doctor is a defendant." (*Matchett* v. *Superior Court, supra,* 40 Cal.App.3d at p. 629, italics added.)

We have found absolutely no evidence in the legislative history of the original bill to support the contention section 1157 was intended to apply to criminal actions. ■ Without evidence, such an implication runs counter to the principle that "privileges should be narrowly construed since they prevent the admission of relevant and otherwise admissible evidence and may obstruct the attainment of justice. [Citations]" (*West Covina Hospital* v. *Superior Court, supra,* 41 Cal.3d at p. 851.) ■ However, our inquiry must not stop here. The legislative history of the amendments to section 1157 made since the passage of Proposition 8 may shed further light on the Legislature's intent in their use of the word "discovery" within section 1157.

The first post-Proposition 8 amendments made to section 1157 came in 1982. Assembly Bill No. 2700, authored by Assemblyman Allatorre, made amendments to Civil Code sections 43.7 and 43.8, as well as to section 1157. The amendments to these former sections supplied members of medical-dental and veterinary peer review committees with immunity from monetary liability for injuries caused due to the actions of the committees. The amendments to section 1157 simply added medical-dental and veterinary staff committees to the list of those committees whose records were immune from "discovery." The language of section 1157, subdivision (e) was not added to section 1157 at this time; thus there is no reference at all under the 1982 amendments to criminal actions.

In 1983 three different bills affecting section 1157, Assembly Bill No. 1502, Assembly Bill No. 463, and Senate Bill No. 396 were enacted by the Legislature. Senate Bill No. 396 (Stats. 1983, ch. 289) was the first to be signed by the Governor, and merely added dietitians to the list of staff who are protected by Civil Code section 43.7 and committee records that are given immunity from discovery under section 1157. Assembly Bill No. 1502 (Stats. 1983, ch. 422), authored by Assemblyman Brown, was the next to be enacted, and extended section 1157 to podiatric staff and review committees. It is in this bill that we see for the first time the language which was to become subdivision (e) of section 1157: "the amendments made to this section at the 1983 portion of the 1983-1984 Regular Session of the Legislature shall not exclude the discovery or use of relevant evidence in a criminal action." (Stats. 1983, ch. 422.)

The Legislative Counsel's Digest of Assembly Bill No. 1502 makes no mention at all of the language quoted above. It simply says "[t]his bill

[extends section 1157] to podiatric staffs and podiatric review committees, as specified." If the Legislature had intended that the records of podiatric committees should be available to criminal discovery under an exception to the body of section 1157, we would expect to see some mention of this fact in the Legislative Counsel's Digest.

Assembly Bill No. 463 was again part of a larger health care bill authored by Assemblyman Allatorre. The bill amended sections 2475 and 2499.5 of the Business and Professions Code and sections 43.7 and 43.8 of the Civil Code as well as section 1157. As introduced, the bill sought to amend only the Civil Code, and related exclusively to immunity for peer review committees and professional societies from *civil liability*. (Assem. Bill No. 463 (1983-1984 Reg. Sess.), introduced Feb. 3, 1983.) This portion of the bill remained substantially untouched by the subsequent amendments. (See Assem. Amend. to Assem. Bill No. 463 (1983-1984 Reg. Sess.), Apr. 27, 1983, May 25, 1983; Sen. Amend. to Assem. Bill No. 463, July 13, 1983, Aug. 15, 1983, Aug. 25, 1983.)

The amendment to section 1157 was added to Assembly Bill No. 463 by the Senate August 25, 1983. Assembly Bill No. 463 merely combined the amendments to section 1157 which had already been made by the two earlier bills; it added no new subject matter. It was important nevertheless, because under Government Code section 9605, "in the absence of any express provision to the contrary in [a] statute which has a higher chapter number, it shall be presumed that a statute which has a higher chapter number was intended by the Legislature to prevail over a statute which is enacted at the same session but has a lower chapter number." Hence, without the consolidation of the earlier amendments into Assembly Bill No. 463, the last of the two, Assembly Bill No. 1502, would "prevail," and the protection to dietitians under Senate Bill No. 396 would have been lost.

Although Assembly Bill No. 463 incorporated the nascent subdivision (e) language from the earlier bill, again the Legislative Counsel's Digest failed to make mention of the provision: "Existing law provides that the records or proceedings of committees of certain professional staffs of hospitals, and of certain health care professional review committees are not subject to discovery. [¶] This bill would provide that *those immunities from discovery* apply to records or proceedings of registered dietitian staffs, registered dietitian review committees, podiatric staffs, and podiatric review committees, as specified." (Legis. Counsel's Dig., Assem. Bill No. 463, 4 Stats. 1983 (Reg. Sess.) p. 382, italics added.)

Again we note the absence of any indication in the Legislative Counsel's Digest that Assembly Bill No. 1081 was intended to have the effect of

conferring a different privilege on dietitian and podiatric staffs and committees as compared to other groups that already had the privilege under section 1157. On the contrary, the Legislative Counsel's Report states that Assembly Bill No. 463 confers "those immunities" from discovery which are already extended to "certain health care professional review committees."

The 1985 amendments to section 1157 were made in Senate Bill No. 328 (Stats. 1985, ch. 725). The main relevance of this amendment was to add psychologists to the growing list of medically oriented peer review committees whose records are protected under section 1157. The amendment also added a subsection format to the statute, thus creating subdivision (e), which was now amended to read: "[t]he amendments made to this section by Chapter 1081 of the Statutes of 1983, or at the 1985 portion of the 1985-86 Regular Session of the Legislature, do no exclude the discovery or use of relevant evidence in a criminal action."

Our conclusion that subdivision (e) was not intended to provide a limitation on the immunity supplied by the body of section 1157 also finds support in the legislative history surrounding the latest amendment to section 1157 in 1990. This amendment was part of Assembly Bill No. 1565, introduced by Assemblyman Sher on March 8, 1989, which also amended section 805 of the Business and Professions Code. (Codified as Stats. 1990, ch. 196.) After being amended in the Assembly on April 12, 1989, an analysis of Assembly Bill No. 1565 was prepared for the Assembly Committee on Health. This report, dated April 18, 1989, states, "This bill extends the *existing prohibition* on discovery of the records or proceedings of peer review bodies to organized peer review bodies of clinics . . . ." (Italics added.)

After the penultimate amendment to Assembly Bill No. 1565 in the Assembly on January 18, 1990, the bill contained the text to be added to section 1157 in its final form. (See Assem. Bill No. 1565 (Reg. Sess. 1989-1990) as amended by the Assem., Jan. 18, 1990.) A Third Reading analysis of the bill, dated January 18, 1990, was prepared by the Office of Assembly Floor Analyses. It reported in part: "[a]s found in Evidence Code 1157, [existing law] provides that neither the 'proceedings nor the records of organized committees' of various professional staffs of hospitals . . . shall be subject to discovery. . . . [This bill] includes within those entities that currently enjoy *the immunity from discovery* conferred by Evidence Code Section 1157 all 'peer review bodies' as that term is defined in Business and Professions Code Section 805." (Third reading analysis of Assem. Bill No. 1565, Office of Assem. Floor Analyses, Jan. 18, 1990, at pp. 1-2, italics

added.) This report also fails to point out any distinction between different types of immunity conferred by section 1157; the words "the immunity" imply that there is but one type provided.

A report to the Senate Committee on Judiciary, dated May 22, 1990, cites *Matchett* v. *Superior Court, supra*, 40 Cal.App.3d 623, as best formulating the public policy underlying the enactment of section 1157. It goes on to ask, as the principal question to be answered by the Committee in approving or disapproving of the bill: "SHOULD *THE PROHIBITION* AGAINST DISCOVERY BE EXPANDED TO INCLUDE CLINICS AND MEDICAL GROUPS" (Rep. to Sen. Com. on Judiciary, May 22, 1990, at p. 3, italics added.) Again, there is no mention of a two-tiered immunity within section 1157.

An undated Preliminary Analysis of California's Peer Review Laws, provided by the Legislative Intent Service, was prepared for the Senate Judiciary Committee during its consideration of Assembly Bill No. 1565. The report quotes *Matchett* for the proposition that "confidentiality exacts a social cost because it impairs malpractice plaintiffs' access to evidence. In a damage suit for in-hospital malpractice . . . unavailability of recorded evidence of incompetence might seriously jeopardize or even prevent plaintiff's recovery. Section 1157 represents a legislative choice between competing public concerns." (*Matchett* v. *Superior Court, supra*, 40 Cal.App.3d at p. 629.) The analysis goes on to state "[t]he basic purpose behind California's [peer review] statutes is to create an environment in which persons who engage in peer review may do so without fear of frequent or frivolous *civil litigation*. . . . [T]his is accomplished by immunizing 'peer reviewers' from liability and shielding peer review proceedings from *civil discovery*." (Italics added.)

This report, contained within the files of the Senate Judiciary Committee, clearly states the Legislature's understanding that section 1157, as a "peer review statute," was intended to provide a bar to civil, as opposed to criminal, discovery. We must assume the committee relied upon this report in making their recommendations to the full Senate. The use of the words "civil discovery" can only be interpreted as being intended to make a distinction which was considered to be important. Furthermore in this report, indeed in the entire legislative history of section 1157 we have reviewed, there is absolutely no mention of a distinction between the immunity granted by section 1157 prior to the 1980 passage of Proposition 8 and the immunity granted by the post-1980 amendments.

The purpose of the 1990 amendment to section 1157 was stated by its author, Assemblyman Sher, in an undated response to a request by the Senate

Judiciary Committee for background information on Assembly Bill No. 1565. The request, contained in the Senate Judiciary Committee files and provided by the Legislative Intent Service, asked Assemblyman Sher "What problem or deficiency under current law does the bill seek to remedy?" Assembyman Sher's office responded that the primary deficiency is "the unequal application of the protections of Evidence Code Section 1157: there is no qualitative difference between quality assurance committee activity in certain medical groups . . . now unprotected by Section 1157(a), and the currently protected . . . committees in [sic] hospital medical staffs. . . ." The memo stated further, "The bill [remedies this problem] without amending the substance of Section 1157 as it only affects that care settings to which the section applies."

Assemblyman Sher's response evinces his understanding of section 1157 and the effect of his bill on it. First, the *only effect* the Sher bill was intended to have was to expand the class of "care settings" to which section 1157 applies. Second, it was his understanding his bill would provide clinics and other outpatient health care providers with the same protection as is given to other medical groups, including committees of "hospital medical staffs."

Hospital medical staffs were given protection under the original enactment of section 1157. Hence, Assemblyman Sher sought to bring clinics under the same protection as that given originally by the statute. Yet section 1157, subdivision (e) was amended by Assembly Bill No. 1565 to provide the 1990 amendments to section 1157, like the 1983 and 1985 amendments, "do not exclude the discovery or use of relevant evidence in a criminal action."

We conclude the only likely interpretation of section 1157, subdivision (e) is that it is a statement of assurance by the Legislature that the mentioned amendments do not purport to stray from the original intent of section 1157, thus opening the door to its invalidation. If the amendments were read to exclude records of peer review committees from criminal discovery, the entire section would be susceptible of an attack claiming its unconstitutionality in view of article 1, section 28, subdivision (d), the Victim's Bill of Rights. Because we conclude the Legislature intended section 1157 to provide equal protection to the various medical groups under its umbrella, we hold section 1157 does not confer immunity against criminal-discovery.

This conclusion finds strong support in public policy. Section 1157 does indeed represent a legislative choice between the evils of an injured plaintiff without a remedy and the spectre of a medical community so closed by the fear of civil litigation as to threaten the quality of medical care to the many.

Criminal activity, on the other hand, is by definition so odious a threat that the People, rather than an individual plaintiff, are deemed harmed, and the penalty is correspondingly harsher. Because the choice between providing immunity for peer review committee records and allowing criminal actions to go unpunished is different than the choice we think was made by the Legislature in enacting section 1157, we will not now presume to make that choice for them.

II. EVEN IF THE LANGUAGE OF SECTION 1157, SUBDIVISION (E) IS NOT FACIALLY AMBIGUOUS, THE 1990 AMENDMENTS TO SECTION 1157 REQUIRE THAT MEMORIAL'S PEER REVIEW COMMITTEE RECORDS AND PROCEEDINGS BE SUBJECT TO DISCOVERY IN A CRIMINAL ACTION.

Although we think that section 1157, subdivision (e) is facially ambiguous, even if we were to find otherwise we would be required to hold that the documents which Memorial seeks to keep from the People in this action are subject to discovery in a criminal action.

If the language of section 1157, subdivision (e) is not facially ambiguous, it can only have one of two possible meanings, as mentioned above. One of these interpretations, that the addition of subdivision (e) in 1983 simply meant to clarify that subsequent amendments were not intended to change the original meaning of section 1157, leads to the conclusion that the records of peer review committees of all the various classes falling under the statute are not exempt from criminal discovery, as we have shown.

The other possibility is that the amendments expressly mentioned in section 1157, subdivision (e) describe care-giving institutions whose peer review records have a more limited exemption from discovery than those listed in the body of section 1157(a). That is, subdivision (e) can be understood to imply that only the records of *the classes of care givers added in 1983, 1985, and 1990* are subject to discovery in a criminal action, whereas those classes that came under the protection of section 1157 prior to 1983 are exempt from criminal *and* civil discovery.

If we assume that the language of the statute is not ambiguous, and that section 1157, subdivision (e) has this latter meaning, then we must ask whether the records of Memorial's in-house peer review committees are protected by the pre-1983 text, or are included within the section 1157, subdivision (e) exception. The characterization of Memorial as falling within one of these classes is a critical factor in deciding whether or not the

prohibition against discovery in a criminal action applies to the documents sought in the People's statement of property sought by search warrant.

The 1990 amendments to section 1157 extended the section 1157 protections to the records and proceedings of an organized committee of "a peer review body, as defined in Section 805 of the Business and Professions Code." (See Assem. Bill No. 1585 (codified as Stats. 1990, ch. 196).) The amendments also provided the now familiar addendum to section 1157, subdivision (e), providing that the amendments made "at the 1990 portion of the 1989-90 Regular Session of the Legislature" do not exclude the discovery or use of relevant evidence in a criminal action." (See *ibid.*) Taken together, these clauses must mean that the records of any peer review body, as defined by section 805 of the Business and Professions Code, are susceptible to discovery in a criminal action.

Assembly Bill No. 1565 itself amended section 805 of the Business and Professions Code. After passage of Assembly Bill No. 1565 the definition of a "peer review body" included "[a] medical or professional staff of any licensed health care facility licensed under Division 2 (commencing with Section 1200) of the Health and Safety Code." Although section 805 was subsequently amended further in 1990 by Senate Bill No. 2375, this definition of a "peer review body" remained within Business and Professions Code section 805, subdivision(a)(1)(A), and remains today. (See Sen. Bill No. 1565 (codified as Stats. 1990, ch. 1597); see also Bus. & Prof. Code, § 805.)

Division 2 of the Health and Safety Code (§§ 1200-1794.29), includes hospitals within its definition of a licensed health care facility. (See Health & Saf. Code, §§ 1250 and 1256.) Hence, clearly section 1157's reference to a "peer review body" must include hospital staff committees. Because this reference to a peer review body was added to section 1157 by the 1990 amendments, which are subject to subdivision (e), the language of section 1157, taken as a whole, can only mean that records of hospital peer review committees which are "relevant evidence in a criminal action" are subject to discovery.

Neither the People nor Memorial disputes that section 1157 as originally enacted applied to the records and proceedings of hospital peer review committees. Similarly, although we think otherwise as stated above, both parties are willing to agree that the language of section 1157, subdivision (e) is unambiguous and to assume arguendo that the subsection refers to the sole classes of professional committees whose records are subject to discovery in a criminal action. Where the parties differ, then, is in whether to accept the

section 805 definition of a "peer review body" at face value, as we are unmistakably directed to do under section 1157, subdivision (a), or whether to assume the Legislature intended only to add new classes of professional care-giving institutions to section 1157, thus preserving the exemption from discovery in criminal actions for hospitals.

According to Memorial it makes no sense to think that in purporting to expand section 1157's protections to clinics and health care plans, the Legislature would actually limit the protection already granted to hospitals without making it more apparent that this was their intention. However, we believe that the language of section 1157, subdivision (a) could not be more clear. It defines the term "peer review body" by reference to another section which clearly includes committees of hospital staff within its purview. Apparently Memorial seeks to rebut the clarity of the statutory language by characterizing the result as being absurd or without justification.

■ Of course, Memorial is correct in contending that even unambiguous statutory language need not be given effect if the result "would lead to absurd consequences which the Legislature did not intend." (*People* v. *Pieters* (1991) 52 Cal.3d 894, 898 [276 Cal.Rptr. 918, 802 P.2d 420].) But the key to this rule, as in every rule of statutory construction, is that it is the Legislature's intent that matters; the policy furthered by the result need be immediately apparent to neither the litigants nor the judiciary as long as supported by clear evidence that the Legislature intended that result. Therefore while " '[t]he intent prevails over the letter' " of the statute, " 'the letter will, if possible, be so read as to conform to the spirit of the act.' " (*Id.* at p. 899 (quoting *Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].)

■ Thus, even if Memorial were correct in characterizing the result of the 1990 amendments to section 1157 on hospital peer review records as "absurd," we must examine the intent of the Legislature in enacting the amendments. Unless there is a lack of clear evidence the Legislature intended to protect the public by more closely monitoring medical facilities against acts of criminal negligence, we must find section 1157 an accurate representation of the will of the Legislature. ■ Moreover, we must not attempt to interpret a statute in a vacuum, but "[must] read every statute 'with reference to the entire scheme of law of which it is a part so that the whole may be harmonized and retain effectiveness.' " (*People* v. *Pieters, supra,* 52 Cal.3d at p. 899 (quoting *Clean Air Constituency* v. *California State Air Resources Bd.* (1974) 11 Cal.3d 801, 814 [114 Cal.Rptr. 577, 523 P.2d 617].)

■ Turning now to the case before us, we note section 1157's explicit reference to Business and Professions Code section 805 as an indication of

the possibility of some linkage between the sections. Further supporting this possibility is the fact that Assembly Bill No. 1565 (Stats. 1990, ch. 196) included amendments both to section 1157 and Business and Professions Code 805. We therefore find it is reasonable to inquire whether both sections comprise part of an "entire scheme of law," as contemplated by the California Supreme Court.

The goal of section 1157, as stated above, is to encourage candor between the staff of professional health care institutions in order to allow the efficient and effective monitoring of patient care at these institutions. The ultimate beneficiary of this candor is the general public. The public gains greater certainty of high quality health care through the peer review process, because peer review committees are more likely to be fully informed as to patient care, and may take swift measures where the quality of such care is threatened by an act of malpractice. Hence, the purpose of section 1157 is to protect the public.

Business and Professions Code section 805 requires a report, called an "805 report," to be filed with the appropriate state regulatory agency by the chief of staff or administrator of a peer review body if the peer review body denies or rejects a licentiate's application for staff privileges or restricts a licentiate's privileges for a "medical disciplinary cause or reason." A "licentiate" under Business and Professions Code section 805 includes a physician.

In 1990, the same session of the Legislature in which the 1990 amendments to section 1157 were passed, a comprehensive overhaul of the physician discipline system which included amendments to Business and Professions Code section 805 was passed unanimously by both houses of the Legislature. (See Sen. Bill No. 2375 (codified as Stats. 1990, ch. 1597); see also Sen. Final Hist. (1989-1990 Reg. Sess.) p. 862.) Section 1 of the bill states the intent of the Legislature: "The 1989-90 Regular Session of the Legislature declares that the physician discipline system administered by the board's Division of Medical Quality is inadequate to protect the health, safety, and welfare of the people of California against incompetent or impaired physicians. [¶] It is, therefore, the intent of the Legislature to restructure the physician discipline system of the Medical Board of California in order to give it authority to act quickly in extreme cases . . . in the interests of protecting the people of California."

It is clear, therefore, that the intent of the Legislature in enacting section 1157 and Business and Professions Code section 805 was to promote the same goal of improved public health and safety. Furthermore, both statutes are aimed at reducing the risk of harm to a patient caused by the incompe-

tence of a physician or other health care professional. Hence, we conclude both sections 1157 and 805 are part of the same statutory scheme, and section 1157 must be read in a light consistent with section 805 so as to preserve as nearly as possible the Legislature's intent in enacting this scheme.

In examining the legislative history of Business and Professions Code section 805 it is immediately apparent that in 1990 the Legislature was gravely concerned that the measures then in place for protecting the public from injury due to physician impairment or incompetence were woefully inadequate. (See Stats. 1990, ch. 1597, *supra*, § 1.) The amendments made to Business and Professions Code section 805 in 1990 were added by Senate Bill No. 2375. The bill strengthened the reporting requirements of that section by raising the penalty for an intentional failure of peer review bodies to file a "805 report" from a misdemeanor with a maximum fine of $1,200 to a public offense with a fine of up to $10,000. (Bus. & Prof. Code, § 805 subd. (e).) Such a failure, under the bill, would be prosecuted in an action brought by the Attorney General's Office. (*Id.* at subd. (e).) Additionally, the Legislative Counsel's Digest of Senate Bill No. 2375 states: ". . . (8) Existing law requires the [D]ivision [of Medical Quality] or a medical quality review committee or panel thereof, whenever possible, to take such action as is calculated to aid in the rehabilitation of the [physician or] licensee. [¶] This bill would, instead, provide that the division or a medical quality review committee . . . shall have the protection of the public as their highest priority."

Hence, it is abundantly clear that the Legislature intended, in enacting Senate Bill No. 2375, to reorient the emphasis in medical discipline further towards the primary goal of public protection from incompetent or substandard medical care. It is also clear that this goal is part of an overall statutory scheme which may have collateral effects on other provisions of law. The legislative intent manifested in Senate Bill No. 2375 provides abundant evidence that the Legislature in its 1990 Session wanted to supply additional public safeguards from acts of gross negligence or incompetence by a physician. The fact that section 1157 is indirectly affected by this bill is not an "absurd" result, rather, it is entirely in keeping with the spirit of the act. Under such an interpretation, only when there is evidence of such a high degree of negligence that it justifies a finding of probable cause for a criminal act will the records and proceedings of a hospital peer review committee be open to discovery.

Any other interpretation does not make intuitive sense. Under the interpretation that Memorial urges, hospitals would be exempt from revealing their peer review records in criminal actions, but clinics and health care

plans, newly integrated within section 1157 in 1990, would not be similarly exempt. We believe that it is this interpretation, rather than the People's, which leads to absurd results unsupported by the intent of the Legislature.

Therefore, we conclude even if the language of Evidence Code section 1157, subdivision (e) is not facially ambiguous, the 1990 amendments to section 1157 made the records and proceedings of hospital peer review committees subject to discovery in a criminal action.

### III. THE PEOPLE SEEK ACCESS TO RELEVANT EVIDENCE IN A CRIMINAL ACTION.

Having held section 1157 does not apply to discovery in a criminal action, we still must characterize the present case as a criminal or a civil action. Although this characterization is a crucial one, we do not believe it is overly difficult.

The distinction between a criminal case and a civil case is generally clear. A civil action "is prosecuted by one party against another for the declaration, enforcement or protection of a right, or the redress or prevention of a wrong," (Code Civ. Proc., § 30) whereas "a criminal action is prosecuted in the name of the People of the State of California, as a party, against the person charged with the offense." (Pen. Code, § 684.) Thus, "it is easy to distinguish a civil action (A v. B) from a criminal action (People v. B)." (3 Witkin, Cal. Procedure (3d ed. 1985) Actions, § 16, p. 48.)

The proceedings below were brought under Penal Code section 1524, located within a section of that code entitled "Special Proceedings." Penal Code section 1524 prescribes the method to be followed by a court in issuing a search warrant. Under Penal Code section 1524, subdivision (a)(4), a search warrant may be issued when the property to be seized consists of items which tend to show that a felony has been committed, or that a particular person has committed a felony. Penal Code section 1524, subdivision (c) provides that no search warrant may issue for documentary evidence in the possession of a professional, such as a physician, who may claim a privilege so long as the professional is not reasonably suspected of engaging in criminal activity related to the documentary evidence, unless a court-appointed special master oversees the service of the warrant, and the subsequent search and seizure of the documentary evidence. Should the party served with the search warrant claim that an item is subject to an immunity or privilege, the special master is to seal the documentary evidence, and a hearing will be held where the party may move to have the contested evidence returned. (Pen. Code, § 1524, subd. (c)(2).)

In this case, rather than obtaining a warrant requesting the appointment of a special master, sealing the items sought, and then bringing them to court, the People sought to streamline the process by having Memorial make their objections and assert their privileges prior to serving the search warrant. Memorial brought the documents to court and produced them for the in camera inspection of the judge, in order to assist the court's determination whether to grant the request for a search warrant in whole or in part. In camera inspection of disputed documents within Penal Code section 1524 special proceedings is specifically provided for by section 915. (See *Deukmejian* v. *Superior Court* (1980) 103 Cal.App.3d 253, 260 [162 Cal.Rptr. 857].) Although the letter of Penal Code section 1524 was not followed in the special proceeding below, we conclude that the delivery of the peer review records by Memorial to the trial court for in camera inspection, and the court's retention of the documents under seal pending the outcome of the present action places this special proceeding under application of section 1524 of the Penal Code.

While neither Memorial nor Dr. Borden has been charged with a crime, the People's request for a search warrant was brought as part of an investigation of allegedly criminal conduct by Dr. Borden. The People anticipate that seizure of the items sought under the warrant will provide evidence which will support the filing of a complaint against Dr. Borden for criminal negligence under section 20 of the Penal Code. There is no intimation that the documents sought under the search warrant are to be used in a civil action. Hence, there is no doubt but that the special proceeding underlying this petition for writ is fully grounded in criminal, rather than civil law.

Hence, the only remaining question is whether the special proceeding below is a "criminal action" as provided in section 1157, subdivision (e). A "criminal action," as defined by section 683 of the Penal Code, is "[t]he proceeding by which a party charged with a public offense is accused and brought to trial and punishment." Under a strict reading of this provision, Penal Code section 683 would seem to exclude special proceedings of a criminal nature in which a defendant has not yet been charged. Yet the analogous provision in the Code of Civil Procedure takes a different tack, providing that for purposes of civil discovery, an " '[a]ction' includes a civil action *and a special proceeding* of a civil nature." (Code Civ. Proc. § 2016, subd. (b)(1), italics added.)

Memorial contends that, because the People seek access to their files on Dr. Borden before filing criminal charges, this is a civil action. However, a search warrant is not a tool of civil discovery, but solely for use in criminal investigations. Moreover, the People do not endeavor to gain access to these files to enforce *private* rights, but rather seek to protect the public from

*criminal* acts of medical malpractice. They have provided an affidavit and statement of probable cause which alleges that there are grounds which would lead a reasonable man to believe Dr. Borden acted with criminal negligence. This conduct allegedly resulted in the death of two patients. The trial court agreed there was probable cause insofar as it issued a search warrant for the documents it believed were reachable under section 1157. Only after obtaining a valid search warrant are the People entitled to examine Memorial's documents. Hence, a potential criminal defendant's interests are fully protected by constitutional safeguards when the state attempts to seize property for use in a criminal investigation.

None of these safeguards are necessary in civil discovery. However, unlike a civil action in which discovery may not be undertaken until an action is filed, a search warrant, obtained upon a showing of probable cause and affirmed by a neutral magistrate, may be used prior to filing criminal charges. We believe the reasons for this discrepancy are clear: due to the more serious nature of the criminal charge, this policy discourages meritless criminal charges from being filed. Only after examining the evidence and determining if they have grounds for a criminal charge will the law enforcement body file charges.

This policy also reflects a judgment the interests of society as a whole deserve more deferential treatment than those of an individual plaintiff. Thus, given the requisite burden of showing probable cause, the public interest permits the People to make a search of property in a private party's possession prior to filing charges.

If we were to accept Memorial's argument that a special proceeding under Penal Code section 1524 is not a criminal action, the People would be greatly hampered in obtaining evidence of criminal acts of medical malpractice. Because we find it clear the Legislature in its 1990 session displayed its intention that such acts be discovered and prosecuted more vigorously, such a result would fly in the face of the clear scheme of law as a whole.

We conclude a special proceeding under Penal Code section 1524 is a "criminal action" with regard to the issuance of a search warrant for discovery of the records of a hospital peer review committee within the meaning of section 1157, subdivision (e). In so holding, we do not believe we are opening the door to a substantial weakening of section 1157 immunity. The relative rarity of factual situations which give rise to criminal charges against a physician, will militate against a chilling of open and candid discussion at peer review committees meetings.

### Disposition

Let a peremptory writ of mandate issue directing the superior court to vacate its order of February 1, 1991, modifying the property to be seized

under the search warrant sought by petitioner, the People of the State of California, and further directing that the superior court enter a new and different order granting the People the right to obtain the property listed in the statement of property to be seized.

Lillie, P. J., concurred.

**WOODS (Fred), J.,** Concurring.—I write separately to accentuate the concerns, first identified in the lead opinion, over the effect that the elimination of Evidence Code section 1157 discovery immunity in criminal prosecutions will have on the medical "peer review" system. As pointed out in the lead opinion, Evidence Code section 1157 was enacted so that medical peer review committees would have full rein to examine with complete candor claimed deficient medical treatment by a medical doctor or provider of medical services without fear that comments, deliberations, or documentation would eventually be revealed in litigation. The lead opinion now opens peer review to *criminal* discovery via search warrant and eliminates the protection of Evidence Code section 1157. The inference is inescapable that the lead opinion creates a chink in the armour of peer review independence. I am fearful that the conclusion reached in the lead opinion will have a deep "chilling effect" on peer review and thus weaken the system. This would be an unfortuante turn of events since, in my opinion, peer review is the mainstay in checking on the maintenance of day-to-day quality medical care being given to hospital patients.

However, I stop short of registering a dissent to the lead opinion in view of the fact that I find the legislative analysis of Evidence Code section 1157 as contained in the lead opinion to be marginally persuasive. I believe that the subject is a proper one for the Legislature to immediately address. I would urge the Legislature to immediately address the problems created by this opinion, in its manifest erosion of Evidence Code section 1157 discovery immunity, at the very earliest moment so that any detrimental effect on the California peer review system can be minimized and carefully contained.

Other than as stated, I concur in the judgment of the lead opinion.

The petition of real party in interest for review by the Supreme Court was denied December 19, 1991. Mosk, J., and Panelli, J., were of the opinion that the petition should be granted.